# In the
# United States Court of Appeals
## For the Seventh Circuit

_____

No. 07-2581

WELLS FARGO BANK, N.A.,

*Plaintiff-Appellant*,

*v.*

PAUL SIEGEL,

*Defendant-Appellee.*

_____

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 05 C 5635—**Samuel Der-Yeghiayan**, *Judge.*

_____

ARGUED JANUARY 22, 2008—DECIDED SEPTEMBER 2, 2008

_____

Before EASTERBROOK, *Chief Judge*, and WOOD and SYKES, *Circuit Judges.*

WOOD, *Circuit Judge.* Ty-Walk Liquid Sales, Inc., provided products and marketing services to farmers. Unfortunately, it fell on hard times and closed its doors on August 23, 2001, leaving behind millions of dollars of debt that it owed to Wells Fargo Bank, N.A. The debt was secured by, among other things, Ty-Walk's accounts receivable, and one of those accounts was with defendant

Paul Siegel. When it could not collect from Ty-Walk, Wells Fargo turned to Siegel to collect the monies Siegel owed to Ty-Walk under an oral contract. After a bench trial, the district court concluded that the scope of the agreement was not as broad as Wells Fargo believed, and thus that Wells Fargo could not recover against Siegel. Wells Fargo appeals; we affirm.

**I**

Over the years, Wells Fargo loaned a substantial amount of money to Ty-Walk, which was in the business of selling fertilizer, chemicals, and various farming services, including a grain-marketing program through which Ty-Walk tried to help grain producers obtain the best price for their production. At times, the program included trading in grain futures.

One of Ty-Walk's customers was Paul Siegel, who has been a farmer since the mid-1970s. Siegel's relation with Ty-Walk began in the early 1990s, when he attended several meetings at Ty-Walk's facilities about grain marketing and trading. Siegel also had face-to-face discussions about grain-marketing strategies with Ty-Walk's CEO, John C. ("Buzz") Gibbons. Frequently giving informal sales pitches to farmers at breakfast meetings, annual dinners, barbeques, and the like, Gibbons was the face and engine of Ty-Walk. Around 1995 Siegel decided to move his business to Ty-Walk, because it charged a lower commission than the company he had been using. At first Siegel simply bought fertilizer and chemicals from Ty-Walk; soon he began to participate in its marketing pro-

gram. It is undisputed that at that time, Siegel and Gibbons (speaking for Ty-Walk) entered into an oral contract that set the terms of Siegel's participation in the program. The point of contention is whether that agreement included Siegel's authorization for Ty-Walk to trade futures on his behalf.

Siegel kept his business with Ty-Walk for six years, until Ty-Walk ceased operations on August 23, 2001, and Wells Fargo sued to recover the millions that Ty-Walk owed on its loans. Wells Fargo's suit in the Circuit Court of Kendall County resulted in an order granting it possession of the collateral on those loans. That order may have ended one phase of the litigation, but it marked the beginning of a new one: Wells Fargo's collection efforts.

One step Wells Fargo took was to send a letter to Siegel, demanding that he pay Wells Fargo $380,525.32, the balance that Wells Fargo alleged was due on Siegel's marketing-program account. The letter further demanded that Siegel pay another $50,785.16, the amount that Wells Fargo said was due on a loan that Siegel took out from the Commodity Credit Corporation ("CCC"), a U.S. government agency that loans money to farmers using commodities as collateral. Both parties agree that Ty-Walk paid off the CCC loan on Siegel's behalf in September 2000. The question remaining is whether Siegel repaid Ty-Walk for its discharge of that debt: Wells Fargo says no; Siegel says yes.

When Siegel ignored its payment demand, Wells Fargo initiated this lawsuit in federal district court, invoking the court's diversity jurisdiction. It claimed that Siegel had

breached his contract with Ty-Walk by failing to pay Ty-Walk the sums due under his marketing-program account and his CCC loan, and (by virtue of the state court order) that Siegel now owed those sums to Wells Fargo. The complaint, filed in September 2005, also asserted a third claim, based on approximately $20,000 in goods and services that Ty-Walk allegedly provided to Siegel but for which Siegel had not paid. After discovery, Wells Fargo moved for summary judgment on each claim. The district court denied the motion for the counts based on the marketing-program account and the CCC loan, but granted it with respect to the claim for $20,000 in goods and services. Siegel's post-trial motion challenging the $20,000 judgment against him was denied; he paid the amount due on that claim.

Wells Fargo's remaining two claims proceeded to a bench trial, which took place on April 23-24, 2007. Wells Fargo did not produce a single witness who could testify about the formation of any contract, verbal or otherwise, between Ty-Walk and Siegel. Instead, the bank relied primarily on documentary evidence, including Ty-Walk's financial records and accounting books, audit letters, and commodity statements sent to Siegel purportedly reflecting the status of his account. It also introduced more than 200 documents evidencing individual transactions between Siegel and Ty-Walk over the course of their six-year business relations. Wells Fargo argued that these documents provided conclusive proof that Siegel and Ty-Walk had an oral agreement, and that the agreement included Siegel's authorization for Ty-Walk to engage in futures trading on his behalf.

In its appellate briefs, Wells Fargo refers to the documents showing individual transactions between Siegel and Ty-Walk as "contracts." Each document shows the crop year in which that particular trade took place. Some, but not all, of them refer to "corn futures" or "bean futures," and some use other words, such as "puts" and "calls," that imply futures-trading transactions. For each of these documents, Ty-Walk sent a trade-confirmation invoice to Siegel. Siegel kept a copy of the invoices in his files, and many of them were entered into evidence.

Siegel testified at the trial on his own behalf. Indeed, with respect to the CCC loan, he provided the only evidence in the record. We address everything related to that issue below. With respect to the alleged debts related to futures trading, Siegel asserted that his arrangement with Gibbons (and hence Ty-Walk) was only an agreement to sell grain for cash. He maintained that he did not anticipate any futures trading, and that he never gave Ty-Walk permission to perform options or futures trading on his behalf. Rather, as he described it, he simply delivered grain to Ty-Walk and got paid for it. He never thought that he owed any balance to Ty-Walk, because only a few days normally elapsed between his delivery of the grain and his receipt of payment. As for the documents that Wells Fargo now calls "contracts," Siegel testified that they were not intended to be contracts at all; they were just the records generated after a trade took place, to confirm that the transaction had occurred. Ty-Walk sent them to Siegel with instructions that he sign and return them, and he obliged. He testified—and the documents plainly show—that Siegel frequently put question

marks and comments on the forms. He explained that he did so because he did not understand the terms and wanted to indicate that he neither understood nor agreed with the parts of the documents to which his comments were directed. Though he often wrote questions on the forms before returning them, no one from Ty-Walk responded to his concerns.

Siegel also testified about a series of audit confirmation letters that were entered into evidence. The letters were similar to the commodity statements that Siegel received, in that each showed the amount that Ty-Walk believed Siegel owed on his marketing-program account as of a given date. The audit letters requested that Siegel confirm "directly to our auditors . . . the amount receivable from you/payable to you on [date] on your farmer marketing account." They then displayed two columns: "Crop Year" and "Amount Due." The last line of the columns reflected the total balance that Ty-Walk thought was owed (or due) on the account, followed by an instruction that the letter's recipient should "inform our auditors whether this balance is in agreement with your records. Indicate your answer below and mail it to our auditors in the enclosed, pre-addressed, stamped envelope." At the bottom of the page were two choices, followed by a signature line:

_____ The balances shown above are correct.

_____ The balances shown above are not correct. See detail of the difference on the reverse side of this form.

On the audit letters dated August 19, 1998, and September 2, 1999, Siegel put an "x" next to the option stating that the

balances were not correct, but he did not provide any explanation on the back of the form before signing and returning it. On the 1999 letter, however, he wrote that the amounts reflected "are not cash debt but Grain to be delivered." He testified at trial that what he "was trying to say" with that note was that "I had confusion about why I ever got this and that I was simply making a statement that my account with Ty-Walk was zero and that the only ongoing [activity on the account] was that I was selling grain."

On the last audit letter in the record, dated August 25, 2000, Siegel checked the box stating that the "balances shown above are correct." Next to that he wrote, "Per phone call with Buzz 9/28/00 and its clarifications. PS." Siegel signed the letter on October 3, 2000. At trial, Siegel testified that he had gotten a letter identical to the one dated August 25, 2000, approximately one month before the letter reproduced in the record arrived. We cannot find a copy of this first letter in the record, but Siegel stated that he received it, reviewed it, and, as he had done in the previous two years, checked the box indicating that the balances were not correct. He also wrote that he did not understand or agree with the numbers on the form; he then signed it and sent it in the enclosed envelope, as instructed. Sometime after doing so, he received a phone call on September 28, 2000, from Gibbons. Siegel testified that following his phone conversation with Gibbons, he received another copy of the same letter, again dated August 25, 2000. That is the version we have in the record; on it, Siegel wrote that the balances *were* correct, "Per phone call with Buzz 9/28/00 and its clarifications."

Nevertheless, when asked during cross-examination about his response on the August 25 letter, Siegel stated that it was "not [his] intent" to indicate that the balances were correct:

> Q. You testified that you, in fact, believed that this checkmark here was false, that indeed you believed that the balances were not correct; is that your testimony?
>
> A. Yes, sir.
>
> Q. All right. So you told the auditor something that you believed was false?
>
> A. I believe that with the note here, that clarified what I was trying to say.
>
> Q. Well, does anything in the note say that the balances are not correct?
>
> A. In my mind, yes.
>
> Q. And how was the auditor going to know that was what was in your mind, Mr. Siegel?
>
> A. I presume if they had a question about it, they could have called me.
>
> Q. But when you sent this—and to whom did you send this document?
>
> A. To Ty-Walk.
>
> Q. All right. But you realized, did you not, that it would go to the auditors, ultimately?
>
> A. It came to me from Ty-Walk. It was going back to Ty-Walk.

Q. But you understood it was for use by the auditors; did you not?

A. No.

Q. You didn't?

A. It was a request from Ty-Walk to Ty-Walk.

Q. Well, in the document, Ty-Walk requests that you confirm to the auditors that the balances are correct; isn't that what it says?

A. Yes, sir.

When asked on redirect why he sent the form to Ty-Walk rather than to the auditors, Siegel replied that he did so "[b]ecause it came to me with a self-addressed stamped envelope with Ty-Walk Liquid Sales as both the return address and the mailing address." Siegel was then dismissed; no one asked him about the "clarifications" that he received from Gibbons over the phone. Gibbons did not testify at the trial, and so the court did not hear his view of the phone conversation—nor, for that matter, did it hear Gibbons's perspective on the scope of his oral contract with Siegel. Though Siegel petitioned to compel Gibbons's testimony, the district court denied that request. It is notable that it was Siegel, and not Wells Fargo, who actively sought Gibbons's testimony, in light of the fact that Gibbons was the only person who could potentially have refuted or undermined Siegel's version of the dealings between Siegel and Ty-Walk.

The court also heard from several other witnesses. Wells Fargo presented the testimony of two former Ty-Walk

employees, Cindy McDonald and Barbara St. Germaine. McDonald worked for Ty-Walk as a customer contact representative and general "go-between" who relayed messages from customers to Gibbons. She stated that Gibbons handled all of the trading decisions, and that while it was her general understanding that the marketing program involved the trading of futures, she could not confirm whether Siegel's account involved futures transactions or if Siegel was aware that trading in futures was occurring. She testified that she had never spoken personally with Siegel, that she was not a contact for Siegel's account, and that she did not know whether Siegel had authorized certain trades on his account. She was also unable to say whether certain documents entered into evidence were true and accurate. She did, however, testify that it was her understanding that the documents sent to Siegel—which Wells Fargo calls "contracts" and Siegel labels as mere trade records—were "confirmations of trade" that were "generated after the transaction occurr[ed]."

Like McDonald, St. Germaine testified that she was never contacted personally by Siegel, that she was never assigned to Siegel's account, and that she did not have any personal knowledge about his account. The district court found that while these witnesses "appeared credible, . . . their testimony was of limited relevance due to their lack of personal knowledge on key issues[,] and their testimony was merely tied to general assertions in regards to Ty-Walk's business practices and the documentary evidence presented by Wells." The court emphasized that these witnesses said "that they did not have any personal

knowledge relating to certain business practices at Ty-Walk, which were controlled by Gibbons."

To supplement his own testimony, Siegel called an expert witness, Philip Malefyt. The court found that Malefyt was qualified to testify and offer expert opinions "concerning certain issues before this court, including guaranteed minimum price contracts, hedge to arrive contracts, purchase to arrive contracts, and premium bid contracts." Malefyt testified that in his opinion, Ty-Walk's trading strategy was designed to generate commission income for itself, and that its accounting methods with respect to the marketing program were not customary. His opinion was that the marketing program was in reality a Ponzi scheme. Ty-Walk's documents sometimes reflected money coming in, but they failed to recognize liabilities and rolled over losses so that they would not show up on the books. Malefyt also pointed to places in Ty-Walk's accounting records where amounts that should have been entered as net losses were instead noted as net gains. The district court found that "Malefyt credibly testified and supported his conclusions that Ty-Walk did not follow reliable accounting practices and that its records were not accurate or reliable." It also pointed out that "to the extent that Malefyt has offered certain legal conclusions or testimony relating to topics that he did not have expertise in, we have disregarded such testimony."

Siegel attempted to introduce evidence of a lawsuit that Wells Fargo filed against Clifton Gunderson, LLC, the certified public accounting firm that Ty-Walk hired to

conduct its audits. In that suit, Wells Fargo accused Clifton Gunderson of professional negligence, negligent and intentional misrepresentation, and breach of contract relating to the accounting firm's work on Ty-Walk's financial statements. The complaint alleged that Ty-Walk's grain inventory balance was grossly overstated and that its financial condition based on that inventory was overstated and inaccurate. Siegel wanted the complaint admitted as the statement of a party-opponent, but the district court granted Wells Fargo's motion *in limine* to exclude it. In granting that motion, the court also excluded evidence that explained, at least in part, why Gibbons was unavailable to testify: he was incarcerated as a result of his conviction for crimes relating to the operation of Ty-Walk.

The district court issued its memorandum opinion on June 8, 2007. It found that Siegel and Ty-Walk entered into a verbal contract in 1995 that established the terms of Siegel's participation in the marketing program. The court also found, as Siegel had argued, that no written contract memorialized Siegel's participation in the program or the obligations associated with it, and that Siegel "did not anticipate doing any futures trading," nor did he ever "enter[] into an oral agreement authorizing Ty-Walk to perform futures trading on his behalf." The bottom line was that "Siegel never agreed, verbally or in writing, to allow Ty-Walk to trade futures on his behalf." It also concluded that Siegel had offset Ty-Walk's payment on the CCC loan by delivering grain as collateral, and so it ruled against Wells Fargo on that claim as well.

**II**

A

On appeal, Wells Fargo has tried to reargue the facts, recognizing that it must show that the district court committed clear error. See FED. R. CIV. P. 52(a)(6). As we have often commented, this is a heavy burden, given the deference we owe to the district court's credibility findings and assessment of the relative weight of the evidence.

We first address the claim pertaining to Siegel's marketing-program account. The district court concluded that "Wells Fargo has not shown by a preponderance of the evidence that there was a written or oral agreement formed between Siegel and Ty-Walk that authorized Ty-Walk to trade futures or options on Siegel's behalf." The court noted that the bank's witnesses at trial "lacked personal knowledge of the relevant facts in this case," and it rejected Wells Fargo's contention that its documentary evidence proved that Siegel's initial verbal agreement with Gibbons included an authorization for futures trading. Rather, the court found that "Siegel testified credibly" that he had signed and returned the documents only "because that was what he was instructed to do by Ty-Walk, not because he intended to memorialize a pre-existing contract." The court found support for this conclusion in Siegel's testimony, corroborated by the documents, that he wrote questions on many of the trade records that he signed, indicating that he did not understand certain entries, or that he believed them to be inaccurate. No one at Ty-Walk responded to his questions

or concerns, the court found, and so Siegel could not be faulted for the lack of clarification. This was particularly true, the court continued, given additional evidence, such as Malefyt's expert testimony, the statements of the former Ty-Walk employees, and Ty-Walk's accounting records, showing that Ty-Walk used informal and irregular accounting methods, and that Gibbons "engaged in business with his clients' grains based upon a handshake, phone call, or other informal communication rather than putting agreements in writing, which made it more difficult for Wells [Fargo] to prove its case." In short, the court found that Wells Fargo's evidence was "incomplete and inconsistent," and it concluded that the bank's "pile of documents falls far short of establishing liability on the part of Siegel."

While this was not an open-and-shut case for Siegel, we conclude that there was no clear error in the district court's finding that Siegel never authorized Ty-Walk to engage in futures trading on his behalf. The district court expressly credited Siegel's testimony that he neither anticipated that type of arrangement nor did he understand that Ty-Walk was trading in futures for his account. "Special deference is given to determinations based on credibility findings, which 'can virtually never be clear error.'" *Piggie v. Cotton*, 342 F.3d 660, 663 (7th Cir. 2003) (quoting *Anderson v. Bessemer City, N.C.*, 470 U.S. 564, 575 (1985)). Wells Fargo argues that Siegel's testimony is implausible, because a man who has been a farmer for so many years and has taken classes in grain marketing at junior college must be a "knowledgeable and attentive trader" with sufficient sophistication to understand that

the documents he has signed indicate ongoing trading in futures. But Siegel's testimony is not incredible as a matter of law, particularly in light of the questions and quibbles with which he adorned the trade confirmation forms.

Wells Fargo stresses the fact that Siegel did sign and return these documents to Ty-Walk. A party may not disclaim knowledge of a contract that he has signed by later asserting that he did not read it or understand it. See *Hughes v. United Van Lines, Inc.*, 829 F.2d 1407, 1417 (7th Cir. 1987) ("One who signs a contract in the absence of fraud or deceit cannot avoid it on the grounds that he did not read it or that he took someone else's word as to what it contained."). Following that logic, Wells Fargo argues that Siegel cannot escape the obligations evidenced by the trade-confirmation forms simply by jotting down question marks on them before applying his signature. While that may be true in principle, it presupposes the answer to a central question: were the trade-confirmation forms independent contracts, or were they only documents confirming that a transaction took place in the past? Siegel has argued throughout this litigation that the documents are not "contracts" in the sense of an agreement that binds the parties to future obligations; rather, he asserts, they are merely "trade records" that confirm the occurrence of an earlier trans-action. The bank's own witnesses, former employees of Ty-Walk, echoed Siegel's characterization of these docu-ments, and the district court found that they were merely trade records. That finding was not clearly erroneous.

This would be a different case if Wells Fargo had argued, and proven, that each individual document was a separate contract, and that each contract established a certain sum that Siegel agreed to pay when he signed that particular document. But the bank did not advance that argument in the district court, nor did it spell out such a position in its briefs on appeal. Rather, Wells Fargo at all times has contended only that the documents, as a group, demonstrate that the bank is correct in arguing that the *initial* agreement between Siegel and Ty-Walk authorized futures trading. In other words, Wells Fargo has offered the documents for the sole purpose of establishing the scope of the original verbal agreement that Siegel executed with Gibbons. Because the series of later documents reflects futures trading, its argument goes, it necessarily follows that Siegel authorized and was aware of Ty-Walk's trading of futures on his behalf. But on these facts, we do not think that the trade records conclusively establish the scope of Siegel's arrangement with Gibbons, especially when the district court credited Siegel's testimony to the contrary and when the documents make no reference to the oral agreement.

Had Wells Fargo advanced the position that each document was a separate contract that bound Siegel to the amount reflected as owing for that particular transaction, we might have considered remanding the case to the district court to determine which documents, if any, satisfied the requirements of a binding contract. The end result may (or may not) have been that Wells Fargo could have collected at least part of what it thinks Siegel owes. But the bank has now waived that argument. We can be

certain of this because, after we detected a few ambiguous statements in the briefs that might have been read as articulating an "individual contract" theory, counsel for Wells Fargo expressly disclaimed such an approach when the panel asked about it directly at oral argument.

Looking at the trade confirmations solely to see if they provide evidence that the original oral agreement included Siegel's authorization for futures trading, we cannot find that the district court clearly erred in concluding that they do not. Even Wells Fargo admits that the relation between Siegel and the company was informal, and there simply is no evidence before us that conclusively contradicts Siegel's testimony, credited by the district court, that he never authorized Ty-Walk to trade in futures on his behalf. As the plaintiff in this action, Wells Fargo bears the burden of proving that the agreement was as broad in scope as it believes, and that as a result Siegel had a balance due on his marketing-program account. It has failed to meet that burden.

B

We turn now to the CCC loan. Everyone agrees that Ty-Walk paid off the loan when it sent a check to CCC in the amount of $50,785.16; the question is whether Siegel ever reimbursed Ty-Walk for that payment. If so, then Siegel has no debt on that account to Ty-Walk, and there is nothing for Wells Fargo to reach; if not, then Wells Fargo would be entitled to have Siegel pay it instead. Wells Fargo argues that Siegel never repaid the money to Ty-Walk, while Siegel counters that he repaid Ty-Walk not in

money, but in grain. Siegel testified at trial that he deposited corn as collateral to cover the loan paid by Ty-Walk to CCC, and that he did not need to pay money to Ty-Walk because the value of the corn he deposited exceeded the amount of Ty-Walk's payment on his behalf.

Once again, the district court credited Siegel's testimony and concluded that: (1) Ty-Walk had repaid Siegel's loan by writing a check to CCC; (2) once CCC received the check, it extinguished the loan, and the corn Siegel had delivered to Ty-Walk as collateral was "free and clear"; (3) Siegel never sold the corn warehoused at Ty-Walk for the CCC loan, nor did Ty-Walk ever return that grain to Siegel; (4) Ty-Walk still possessed the collateral corn when it closed its doors on August 23, 2001, and to this day it has not been returned to Siegel; and (5) the value of the corn that Ty-Walk held as collateral exceeded the value of the payment the company made to extinguish Siegel's loan. Based on those facts, the district court concluded that "there was no breach of contract by Siegel and that Siegel does not owe any funds to Ty-Walk in regards to the 2000 CCC Loan."

Wells Fargo faults the district court for ruling in favor of Siegel on this issue "solely on the basis of Paul Siegel's 'say-so.'" It forgets, however, that it was *Wells Fargo's* burden to come forward with proof that Siegel had failed to repay Ty-Walk. Wells Fargo's only reason for criticizing the district court's finding is that there was "no warehouse receipt" and "no paperwork of any kind" to back up Siegel's story. Nothing in the record contradicts Siegel's account, however, and the district court was

entitled to credit his testimony even without supporting documentation. See *United States v. Bailey*, 510 F.3d 726, 733 (7th Cir. 2007). Siegel's testimony was neither preposterous nor in defiance of the laws of nature, and the court did not clearly err in crediting it. The bank cannot now argue for reversal based on a lack of evidence, when it was its own burden to supply the proof of its claim.

*  *  *

The judgment of the district court is AFFIRMED.