# In the
# United States Court of Appeals
## For the Seventh Circuit

Nos. 08-1036, 08-1037, 08-1038, 08-1039,
08-1040, 08-1041, 08-1042

JOSHUA S. KANTER, ESTATE OF
BURTON W. KANTER, and
ESTATE OF NAOMI R. KANTER,

*Petitioners-Appellants*,

*v.*

COMMISSIONER OF INTERNAL REVENUE,

*Respondent-Appellee.*

Appeals from the Decisions of the United States Tax Court.
Nos. 712-86, 1350-87, 31301-87, 33557-87, 3456-88,
32103-88, 25251-90—**Harry A. Haines**, *Judge.*

ARGUED MAY 27, 2009—DECIDED DECEMBER 1, 2009

Before CUDAHY, RIPPLE, and WOOD, *Circuit Judges.*

WOOD, *Circuit Judge.* This case began in 1986, when Burton W. Kanter, a well-known tax attorney and businessman, filed a petition seeking review of the Commissioner of Internal Revenue's determination that he had not paid all his taxes. Since then, the case has taken a

yo-yo path through our judicial system, from the Tax
Court to the Supreme Court and back again. In this itera-
tion, Kanter's Estate and related parties appeal from
an unfavorable Tax Court decision that rejected many of
the factual findings of the Special Trial Judge ("STJ")
that presided over the trial. (We refer to the petitioners
collectively as "Kanter.") The theme of Kanter's argu-
ments on appeal is that the Tax Court did not defer, as
it should have, to the STJ's original findings of fact. In
evaluating the issues Kanter raises, we review the STJ's
original findings of fact for clear error.

Kanter raises five issues on appeal. The first includes
within it a number of challenges to the Tax Court's finding
that Kanter and his associates orchestrated a kickback
scheme and then fraudulently concealed the resulting
income. Kanter argues that the Commissioner is pre-
cluded from litigating this point, as the Fifth and
Eleventh Circuits have already ruled against him in
cases dealing with the liability of Kanter's associates for
the same underlying business arrangements. He also
argues that the Commissioner is barred by the statute
of limitations from seeking tax fraud penalties for 1983.
Kanter's second issue concerns entities called the Bea
Ritch Trusts. The Tax Court found that he was the true
owner of these Trusts and thus should have paid certain
taxes on their economic gains. Kanter argues that he
was not the owner of these Trusts. Third, Kanter urges
that he should not be taxed for half of the earnings of
Century Industries, as the Tax Court lacked jurisdiction
over many of the years at issue and he owed taxes propor-
tional only to his stated ownership interest because all of

the partners were true partners. Fourth, he argues that the Tax Court should not have counted as taxable income over $1,000,000 that Kanter deposited in his bank accounts in 1982, as those monies were nontaxable loans or returns on investment. Finally, Kanter asserts that the Tax Court violated his due process rights by overturning various credibility determinations made by the STJ in his original report.

On the first issue, we reject Kanter's preclusion argument, because nonmutual collateral estoppel does not apply against the United States. On the merits, we conclude that the STJ's factual findings are not clearly erroneous with respect to Kanter's tax liability and tax fraud. As a result, we do not reach Kanter's argument based on the statute of limitations. Next, we find no reversible error in the STJ's conclusion that Kanter was not the owner of the Bea Ritch Trusts; this means that Kanter is not liable for the tax deficiencies that the Commissioner assessed. Third, with respect to Century Industries, we hold that the Tax Court lacked jurisdiction over the 1983, 1984, and 1986 tax years; we further find that the STJ's conclusion that only the 1% interest that Kanter held in Century Industries for the 1981 and 1982 tax years was taxable is not clearly erroneous. We note that the government has conceded the issue relating to the $1,000,000, but for the sake of completeness we confirm that the STJ did not clearly err in finding that this deposit was nontaxable income. Finally, in light of our other findings, we have no reason to reach Kanter's due process argument.

In summary, we conclude that the Tax Court did not show the proper level of deference to the STJ's factual findings. We therefore reverse and remand with instructions to vacate the Tax Court's judgment, to enter an order adopting the STJ's report as its opinion, and to enter judgment consistent with that opinion.

# I

Given the complexity of the arrangements before us, we have chosen to set forth the facts pertinent to each part of the appeal in the relevant section below. We begin, however, with the procedural history that has brought us to this point, since the earlier rulings in the case establish the standard of review that applies. In 1986, Kanter sought review of the Commissioner's assessed deficiencies for various tax years between 1978 and 1986; the case later expanded to include the 1987-1989 tax years as well. Kanter passed away in 2001, and so since then, this litigation has proceeded through his estate and that of his wife, Naomi R. Kanter, who is a party only by virtue of the joint tax returns she filed with Kanter for the years at issue.

In 1994, the Tax Court referred Kanter's case, along with those of his associates Claude M. Ballard and Robert W. Lisle, to Special Trial Judge Irvin D. Couvillion. See 26 U.S.C. § 7443A(b)(4). Judge Couvillion conducted a five-week trial and compiled a sizable record. Then, between May of 1996 and December of 1999, no entries appear on the relevant dockets. At the end of that time, Judge Couvillion produced a 303-page report setting forth

his factual findings and recommending legal conclusions. The Tax Court then assigned Judge Howard A. Dawson to review the STJ's report, and on December 15, 1999, the Tax Court released a decision, signed by Dawson and Couvillion, that stated that it "agrees with and adopts the opinion of the Special Trial Judge, which is set forth below." *Investment Research Assocs. v. Comm'r*, T.C.M. (RIA) 99,407, *1 (1999). The Tax Court decision was unfavorable to Kanter, but two unnamed Tax Court judges informed him that the Tax Court's assertion that it had adopted the STJ's report was actually false. Kanter asked the Tax Court to enter the STJ's report into the record to verify this information, but it refused.

On appeal to this court, Kanter argued that the Tax Court was obligated to release the STJ's decision, and he further challenged several of the conclusions of the Tax Court decision with respect to his taxes. Lisle and Ballard pursued their own appeals in the Fifth and Eleventh Circuits, respectively. See *Estate of Lisle v. Comm'r*, 341 F.3d 364 (5th Cir. 2003) ("*Lisle I*"); *Ballard v. Comm'r*, 321 F.3d 1037 (11th Cir. 2003) ("*Ballard I*"). Taking the STJ and Tax Court at their word that the Tax Court decision was the same as the STJ's, we did not require the Tax Court to release the STJ's decision. *Estate of Kanter v. Comm'r*, 337 F.3d 833, 843-44 (7th Cir. 2003) ("*Kanter I*"). Instead, we reviewed the Dawson opinion of December 15, 1999, concluded that the findings of fact it set forth were not clearly erroneous, and affirmed the judgment. Kanter and his associates then appealed to the Supreme Court, which held that the Tax Court was obliged to release the STJ's report. *Ballard v. Comm'r*, 544 U.S. 40, 52 (2005). We

remanded to the Tax Court for proceedings consistent with the Supreme Court's decision. See *Estate of Kanter v. Comm'r*, 406 F.3d 933, 934 (7th Cir. 2005) ("*Kanter II*"). The Fifth and Eleventh Circuits did the same for Lisle and Ballard. See *Estate of Lisle v. Comm'r*, 431 F.3d 439 (5th Cir. 2005) ("*Lisle II*"); *Ballard v. Comm'r*, 2006 WL 4386510 (11th Cir. July 10, 2006) ("*Ballard II*"). On remand, the Tax Court assigned Kanter's case to Judge Harry A. Haines. The Tax Court then issued another decision, in which it explicitly reversed several of the STJ's factual findings and conclusions of law. See *Estate of Kanter v. Comm'r*, T.C.M. (RIA) 2007-021 (2007). Lisle and Ballard have already appealed from that decision to their respective circuits, which have reversed and remanded the case with instructions to adopt the STJ's decision as the decision of the Tax Court. See *Estate of Lisle v. Comm'r*, 541 F.3d 595, 605 (5th Cir. 2008) ("*Lisle III*"); *Ballard v. Comm'r*, 522 F.3d 1229, 1255 (11th Cir. 2008) ("*Ballard III*"). It is now our turn to confront the case, focusing on Kanter's role and responsibility.

## II

Before we proceed to the merits of Kanter's appeal, we must clear up some issues about the proper standard of review. We review factual findings for clear error. See *Cabintaxi Corp. v. Comm'r*, 63 F.3d 614, 619 (7th Cir. 1995). The parties dispute, however, whether we apply this standard to the STJ's report (Kanter's position) or to the Tax Court's decision (the Commissioner's position). Sometimes the law requires the court of appeals to

look to the original fact findings. See, *e.g., Old Ben Coal Co. v. Prewitt,* 755 F.2d 588, 589 (7th Cir. 1985) (reviewing whether the Administrative Law Judge's findings—not the Benefits Review Board's decision to reverse the Administrative Law Judge—were supported by substantial evidence under the Black Lung Benefits Act); *In re Land Investors, Inc.,* 544 F.2d 925, 933 (7th Cir. 1976) (applying the clearly erroneous standard to the bankruptcy referee's findings of fact, rather than to the district court's application of that standard). At other times, the proper point of reference for the court of appeals is the reviewing body's decision. See, *e.g., Moab v. Gonzales,* 500 F.3d 656, 659 (7th Cir. 2007) (reviewing the opinion of the Board of Immigration Appeals, not the Immigration Judge, when the Board issues a superceding opinion under the Immigration and Nationality Act); *Hall v. Norfolk S. Ry. Co.,* 469 F.3d 590, 594 (7th Cir. 2006) (reviewing the decision of the district court, when the district court itself was reviewing an order of the magistrate judge); *Schwartz Mfg. Co. v. NLRB,* 895 F.2d 415, 416 n.5 (7th Cir. 1990) (applying deference to the factual findings of the Board—not the Administrative Law Judge—as required by statute at 29 U.S.C. 160(e)). It is the legal relationship between the entities that determines which set of findings is entitled to deference.

To resolve the issue now before us, we start with the text of Tax Court Rule 183, which governs the relationship between the STJs and the Tax Court. It states that

> [d]ue regard shall be given to the circumstance that the Special Trial Judge had the opportunity to evaluate the credibility of witnesses, and the findings of fact

recommended by the Special Trial Judge shall be presumed to be correct.

U.S. TAX CT. R. 183(d). The plain language of this rule mandates deference to the STJ: it identifies the STJ as the key actor and says that his or her findings must be given "due regard" and are entitled to a presumption of correctness. Nothing in that rule suggests that the presumption evaporates after the Tax Court has acted and the case has moved on to the court of appeals. If the Supreme Court's opinion in *Ballard* tells us anything, it is that the STJ's findings of fact play a significant role in the appellate review of tax decisions. 544 U.S. at 53-64. The history of the rule also supports this interpretation. As the Supreme Court noted in *Ballard*, this Tax Court rule derives from Rule 147(b) of the former Court of Claims, which interpreted its own rule to require deference to the trial judge's findings of fact. See *id.*, at 54-55; *Hebah v. United States*, 456 F.2d 696, 698 (Ct. Cl. 1972) ("Under our rule, the commissioner's findings of fact are presumed to be correct because of his opportunity to hear the witnesses and to determine the weight to be accorded to their testimony."). Both the rule and its history therefore support the proposition that we, too, should ensure that the Tax Court deferred to the STJ's findings of fact (and in so doing, defer to those findings ourselves).

Congress provided that the court of appeals must review decisions of the Tax Court in the same manner as it reviews decisions of the district court sitting without a jury. 26 U.S.C. § 7482(a)(1). That standard is easy to

apply in cases where the Tax Court judge does not use a special trial judge. In the latter group of cases, however, we must find the best analogy to district court practice. When a magistrate judge prepares a report and recommendation for a district court, the governing statute provides that the district court "shall make a *de novo* determination" with respect to any contested matter. See 28 U.S.C. § 636(b). Rule 53, governing masters, is different. It provides that the district court's review of matters that are the subject of an objection is *de novo* unless the parties have stipulated (with the court's approval) that review will be for clear error. See FED. R. CIV. P. 53(f)(3). When a district court uses a special master, we typically apply deferential review to the original fact-finder's report, ignoring the decision of the district court, although this court at times has reviewed the district court's handling of the report for abuse of discretion. See, *e.g.*, *Cook v. Niedert,* 142 F.3d 1004, 1011 (7th Cir. 1998) (applying the abuse of discretion standard to the district court decision to reject the master's recommended method for calculating attorneys' fees).

The lesson that we draw from these statutes and rules, as well as from the cases we noted earlier, is that each area of the law must be evaluated on its own. The National Labor Relations Act may call for deference to the Board, the Black Lung Benefits Act may call for deference to the underlying Administrative Law Judge findings, the Magistrate Judges' Act may require deference to the district court, and Rule 53 may take a middle approach for masters. Our problem is to determine what the correct rule is for the Tax Court. We are

satisfied, based on the language of Tax Court Rule 183, the gist of the Supreme Court's 2005 decision in *Ballard*, and our sister circuits' opinions in *Lisle III*, 541 F.3d at 600-01, and *Ballard III*, 522 F.3d at 1235, that deference under this regime is owed to the factual findings of the STJ. The Tax Court's application of those findings raises a mixed question of law and fact, and it may be that we would owe some deference to its decisions at that level. We review legal decisions *de novo*, including the legal decision of the Tax Court to review the STJ's fact-findings with a free hand rather than for clear error. See *Johnson v. Orr*, 551 F.3d 564, 567 (7th Cir. 2008).

The Eleventh Circuit picked up that last theme when it identified one sense in which the court of appeals applies clear error review to the Tax Court. As it noted, a central question the appellate court is asking is whether the Tax Court "committed clear error when [it] failed to accord the original findings of fact, credibility of witnesses and conclusions of Judge Couvillion the due deference required under the law." *Ballard III*, 522 F.3d at 1235 n.6. This suggests that review in the court of appeals should proceed through the lens of the question whether the Tax Court gave proper deference to the STJ's findings. To that end, the Supreme Court in *Ballard* noted that the publication of the STJ's findings equipped taxpayers "to argue to an appellate court that the Tax Court failed to give the special trial judge's findings the measure of respect required by [the Rule]." 544 U.S. at 56. In the final analysis, this approach takes us to the same point: the STJ's findings are the ones reviewed for clear error, not those of the Tax Court.

This court's role under clear error review is limited. We must not reverse unless we are "left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948). Thus, if the STJ's account of the evidence is

> plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.

*Anderson v. Bessemer City*, 470 U.S. 564, 574 (1985); *United States v. Raibley*, 243 F.3d 1069, 1076 (7th Cir. 2001). When the STJ's findings involve credibility determinations, the clear error standard "demands even greater deference to the trial court's findings; for only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said." *Anderson,* 470 U.S. at 575; *Wells Fargo Bank, N.A. v. Siegel,* 540 F.3d 657, 663 (7th Cir. 2008). This does not prevent us from finding clear error, however; the "[d]ocuments or objective evidence may contradict the witness' story; or the story itself may be so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it." *Anderson,* 470 U.S. at 575. With these principles in mind, we turn to the issues presented on appeal.

## III

The Commissioner's primary case against Kanter, Lisle, and Ballard rests on his determination that they did not report and in fact fraudulently concealed income received for facilitating business transactions with five people: J.D. Weaver, William Schaffel, Bruce Frey, Kenneth Schnitzer, and John Eulich ("the Five"). The Commissioner's theory is as follows: Kanter and his associates derived income in the form of "kickbacks" in exchange for using their influence within Prudential Life Insurance Company to channel business opportunities to the Five. Kanter then allegedly diverted this income to various entities under his control so that he and his associates would not have to report the income on their personal income tax returns. Instead, it appeared on the tax returns of these entities. The Commissioner assessed tax deficiencies and penalties for tax fraud based on these alleged activities. For a lengthy discussion of the factual background of the Five's specific business transactions, see *Ballard III*, 522 F.3d at 1235-49.

A tax deficiency arises when a taxpayer fails to report taxable income on a personal income tax return. Kanter bears the burden of demonstrating that the Commissioner's determination with respect to the deficiencies he has identified is incorrect. See *Welch v. Helvering*, 290 U.S. 111, 115 (1933) (noting that the Commissioner's "ruling has the support of a presumption of correctness, and the petitioner has the burden of proving it to be wrong"). Tax fraud is a more serious charge, and so a higher standard of proof applies. For fraud charges, the

government "must demonstrate by clear and convincing evidence that the taxpayer intended to evade taxes that he knew or believed he owed." See *Toushin v. Comm'r*, 223 F.3d 642, 647 (7th Cir. 2000). As this suggests, it is the government that bears the burden of proof on a fraud charge. See 26 U.S.C. § 7454(a) ("In any proceeding involving the issue whether the petitioner has been guilty of fraud with intent to evade tax, the burden of proof in respect of such issue shall be upon the Secretary.").

In this case, the Commissioner alleges that Kanter disguised personal income as income of entities that did not in fact earn it. In order to determine whether the entity reporting income is the true earner of that income, this circuit examines the totality of the circumstances. *Schuster v. Comm'r*, 800 F.2d 672, 678 (7th Cir. 1986) (rejecting the two-part test of *Johnson v. Comm'r*, 78 T.C. 882, 891 (1982), and noting that a "flexible test, allowing consideration of all of those factors, better serves our analysis in attempting to determine whether income is to be taxed against the person or entity who actually earned it or against someone else."). Similarly, the question whether fraud has been committed is one of fact that requires an analysis of the entire record. See *DiLeo v. Comm'r*, 96 T.C. 858, 874 (1991).

In reviewing the record produced at trial, the STJ found that no kickback schemes existed. He based this finding largely on the unanimous testimony of the witnesses at trial. With that established, he then rejected the government's theory about Kanter's assignment of income, since the generation of income through something like the

alleged kickback scheme needs to be established before it is appropriate to examine where that income goes. See *United States v. Basye*, 410 U.S. 441, 448-49 (1973). The STJ went on to find that the government had not met its burden of proving fraud, as no kickback schemes existed and all the income at issue had been reported by other entities, as opposed to going totally unreported. The STJ also found it significant that no examining agent had recommended that a fraud penalty should be asserted against Kanter and his associates.

The Tax Court rejected the STJ's finding that there was no kickback scheme; in the process of doing so, it over-turned several of the STJ's credibility determinations. It rejected Kanter, Lisle, and Ballard's testimony as self-serving and contradictory to documentary evidence showing the flow of funds. It dismissed the Five's testi-mony on the basis that it was irrelevant because they did not know about the kickback scheme and thus could not be expected to testify to its existence. The Tax Court also overturned the STJ's finding that there was no fraud. It relied on evidence that it believed showed the existence of a kickback scheme; it also inferred from the complex array of financial mechanisms Kanter created that he intended to commit fraud.

Kanter's case overlaps with those of his associates Ballard and Lisle with respect to these tax deficiency and fraud issues. The Fifth and Eleventh Circuits have already held that the STJ's findings on these issues are not clearly erroneous and that the Tax Court should not have rejected them. See *Ballard III*, 522 F.3d at 1254-55; *Lisle III*, 541 F.3d at 602. Kanter invokes the doctrine of

nonmutual defensive collateral estoppel to argue that the government should be precluded from establishing liability against him by relitigating that factual issue in this court. See *Parklane Hosiery Co. v. Shore*, 439 U.S. 322 (1979). While acknowledging that nonmutual (offensive) collateral estoppel against the government is prohibited by *United States v. Mendoza*, 464 U.S. 154 (1984), Kanter invites us to carve out an exception to the *Mendoza* principle for preclusion for factual issues. The government believes that this possibility is foreclosed by *Mendoza* itself, as well as this court's more recent decision in *Harrell v. United States Postal Serv.*, 445 F.3d 913, 921 (7th Cir. 2006).

The debate over the application of this preclusion doctrine arises because the Supreme Court used somewhat ambiguous language in *Mendoza:*

> We hold, therefore, that nonmutual offensive collateral estoppel simply does not apply against the Government in such a way as to preclude relitigation of *issues such as those involved in this case.*

464 U.S. at 162 (emphasis added). We acknowledge that the *Mendoza* Court was talking about offensive issue preclusion (that is, the use of a finding of fact from an earlier proceeding by a plaintiff, to establish part of its case), not defensive issue preclusion (the use of an earlier finding of fact to support a defense). The policy reasons for treating the government differently, however, seem to us to be just as powerful when applied to defensive preclusion. That said, we note as well that it is not clear what the Court meant in *Mendoza* when it referred to "issues such as those involved in this case."

In *Adkins v. Commissioner*, 875 F.2d 137 (7th Cir. 1989), we entertained the possibility that the Supreme Court wanted to leave open the question whether purely factual issues could be the subject of nonmutual issue preclusion against the government. See *Adkins*, 875 F.2d at 141 ("other passages in the [*Mendoza*] opinion arguably leave open the possibility that estoppel may apply against the government with respect to specific fact determinations, not embracing policy choices and legal issues"). We think it more likely, however, that the Court intended to create a uniform rule precluding the use of the doctrine against the government, and later cases in this circuit support that approach. See *Harrell*, 445 F.3d at 921 ("the Supreme Court has established that nonmutual offensive collateral estoppel does not extend to litigation against the United States"); see also 18A WRIGHT, MILLER & COOPER, FEDERAL PRACTICE AND PROCEDURE § 4465.4 (2d ed. 2002) ("[A]t least three factors must be counted in favor of finding in the *Mendoza* opinion a broad uniform rule that prohibits any nonmutual offensive preclusion against the government. The court of appeals had looked for evidence of a 'crucial need' to permit relitigation; the Court rejected this approach . . . . The Court also observed that its holding did not in any way depend on the uncertain policies against preclusion as to ' "unmixed questions of law" '. . . . And perhaps most important, there is a powerful fairness argument [for preclusion in *Mendoza* as the] injury to the public interest from [finding preclusion] is not great. To deny preclusion in face of this argument may be to show that other arguments for preclusion also will fail."). Thus,

we reject Kanter's argument that he is entitled to defend this case based on the fact that the question whether he participated in a kickback scheme and engaged in tax fraud has already been determined against the Commissioner.

Nevertheless, while the findings of the Fifth and Eleventh Circuits do not resolve the question before us, the opinions of those courts are entitled to the same respectful consideration that we would always accord to sister circuits faced with an identical or similar case. This court never lightly creates a conflict in the circuits, see Seventh Circuit Local Rule 40(e), and we see no reason to do so here with respect to the factual issues that are common to Kanter's case and those of Ballard and Lisle. Like our colleagues, we conclude that the Tax Court's reasons for overturning the STJ's credibility determinations do not reflect clear error review, but instead amount to a *de novo* look at all of the evidence. Moreover, the Commissioner's reasoning that the Five's testimony should be discounted because they were unknowingly engaged in a kickback scheme seems odd at best. This is not to say that there is not plenty of evidence in the record that supports the Commissioner's position and the Tax Court's decision. There is. When we last saw this case, we affirmed the Tax Court's previous decision that found that Kanter engaged in tax fraud with respect to the Five's transactions, finding that such a conclusion could not be branded "clearly erroneous." See *Kanter I*, 337 F.3d at 849. But this does not mean that the only possible view of the facts was the one that the Tax Court had reached. Just as it is possible in the new trial

context "for two judges, confronted with the identical record, to come to opposite conclusions and *for the appellate court to affirm both,*" see *United States v. Williams,* 81 F.3d 1434, 1437 (7th Cir. 1996) (emphasis in original), it is possible for two judges to review the same record and reach different factual conclusions, each of which can withstand clear error review. Critically, at the time we decided *Kanter I,* we did not have before us the STJ's report, which is the one that is entitled to deferential review and which contains the fact-finder's original credibility determinations.

The Commissioner argues that Kanter is liable for transactions with the Five under two theories: fraud and deficiency. With respect to the fraud theory, we are satisfied that STJ Couvillion did not clearly err when he found that no kickbacks were paid. The Commissioner argues that the STJ erred because he did not further investigate the flow of funds from these transactions. That evidence, the Commissioner believes, establishes that money flowed from the Five to Kanter, Lisle, and Ballard. But the STJ was correct—as were the Eleventh and Fifth Circuits—when he reasoned that this theory turns on the existence (or nonexistence) of kickbacks. If there were no kickbacks, then the flow-of-funds argument does nothing to resurrect the fraud theory. See *Ballard III,* 522 F.3d at 1253; *Lisle III,* 541 F.3d at 603. Largely for the reasons that the Fifth and Eleventh Circuits have spelled out, we conclude that the STJ's findings about tax fraud are not clearly erroneous.

The deficiency issue is somewhat different. The flow-of-funds argument could be evidence of a tax deficiency

even if the payments were not kickbacks and were not the result of fraud. Merely identifying non-fraudulent payments among corporate entities does not establish a deficiency. Rather, the key question is whether the income should be attributed to the individual rather than the entity. The Fifth Circuit rejected these theories as applied to Lisle, *Lisle III*, 541 F.3d at 603-04, and the Eleventh Circuit rejected the argument that Ballard personally earned the income in question, *Ballard III*, 522 F.3d at 1254. We come to the same conclusion for Kanter. Contrary to the Commissioner's assertions, the STJ addressed these arguments. The STJ rejected the application of the assignment-of-income doctrine, holding that it "is not applicable because there was no improper shifting of income to a different tree from that on which . . . [such income] grew." The STJ also made a finding rejecting the assertion of identity between Kanter and the Kanter entities—in fact, the STJ held that the Kanter entities exercised significant control over Kanter's activities. In short, the STJ held that "there was no underpayment of taxes." Given that corporate entities are generally recognized for tax purposes, and that the STJ was in the best position to find facts and make credibility determinations, we see no reason to overturn this finding. We recognize that the taxpayer must demonstrate that the Commissioner has incorrectly identified deficiencies. We also recognize that the STJ's opinion does not explicitly spell out that Kanter met this burden with regard to income from transactions with the Five. But, as we are stressing throughout, our review is cabined by the clear error standard. And, despite the

fact that it strikes us as a close call, we have accepted the STJ's finding that there was no underpayment of taxes. We therefore conclude that the STJ did not clearly err with respect to liability based on his transactions with the Five. This holding makes it unnecessary for us to address Kanter's argument based on the statute of limitations governing the fraud penalty for 1983.

## IV

The Bea Ritch Trusts ("BRTs"), named for Beatrice Ritch (Kanter's mother), are a series of 25 trusts established for the benefit of members of the Kanter family. Ritch, the alleged grantor, funded each of the trusts with $100 in 1969. The trust instrument named Solomon Weisgal as the trustee, and Kanter was named a beneficiary of 24 of the 25 trusts (the exception being the Naomi Trust, whose sole beneficiary was his wife, Naomi Kanter). Kanter also possessed the power of appointment for the trusts for which he was a beneficiary, but he testified at trial that he had renounced all beneficial interests and appointment powers in the trusts in the 1970s.

Despite the modest initial corpus, the BRTs acquired substantial assets and net worth by 1987, primarily through investments in various entities, many of which Kanter brought to the attention of Weisgal in his capacity as trustee. The most important for our purposes is the BRTs' purchase in 1973 for $18,000 of an 18% interest in Oyster Bay Associates ("OBA"), a partnership formed to invest in the then-nascent cable television industry. The investment must have exceeded the trustee's fondest

dreams. The entities in which OBA had a stake sold their interests in the cable television venture in 1987, generating substantial capital gains of $2,033,368 that flowed back to the BRTs. The BRTs also made loans to Kanter, $287,030 of which he had not paid back by 1987.

The key date is (or was) 1987 because that is when the Commissioner determined that Kanter was the "true settlor" of the BRTs and thus that at least some portion of the BRTs' gross receipts, interest income, dividend income, passive activity partnership losses, and capital gains income were actually attributable to Kanter for tax purposes, rather than to the BRTs. On further examination, the Commissioner realized that much of the BRTs' capital gains income generated from its investment in OBA had accrued in the 1986 tax year, and the Tax Court granted an oral motion to amend the pleadings to this effect. Kanter does not appeal that technical ruling here.

The default rule under sections 671 to 679 of the Internal Revenue Code is that owners are taxed for trust income, and generally the grantor is treated as the owner. The grantor of a trust (also known as the settlor) is the person who gratuitously transfers assets for the creation of the trust. Normally, the grantor/settlor is the person who established the trust (here, Bea Ritch), and that person's identity is noted in the trust document. It sometimes happens, however, that a person is a settlor "in name only." When there is reason to be concerned about that possibility, the court will conduct a more searching inquiry, examining all the circumstances, to determine

who the true settlor might be. *Stern v. Comm'r*, 77 T.C. 614, 647 (1981). If a grantor is deemed an "owner" of a portion of a trust, that portion attributable to the grantor must be included in the true owner's taxable income. 26 U.S.C. § 671. There are several ways, outlined at 26 U.S.C. §§ 672-79, in which a grantor may be deemed an owner of a trust, but only two of them are relevant for our analysis. 26 U.S.C. § 674(a) states that:

> The grantor shall be treated as the owner of any portion of a trust in respect of which the beneficial enjoyment of the corpus or the income therefrom is subject to a power of disposition, exercisable by the grantor or a nonadverse party, or both, without the approval or consent of any adverse party.

Alternatively, the grantor may be treated as the owner of a portion of the trust if

> [t]he grantor has directly or indirectly borrowed the corpus or income and has not completely repaid the loan, including any interest, before the beginning of the taxable year. The preceding sentence shall not apply to a loan which provides for adequate interest and adequate security, if such loan is made by a trustee other than the grantor and other than a related or subordinate trustee subservient to the grantor.

26 U.S.C. § 675(3).

The STJ considered whether Kanter should be considered the grantor of the BRTs, given that Bea Ritch was named as the trust's settlor. The judge rejected the Com-

missioner's theory that Kanter funded the trusts by directing income from various entities he controlled to the BRTs. (This finding went hand-in-hand with the STJ's prior finding that Kanter was not funneling income from his kickback scheme to the BRTs or other entities with which he was associated.) The STJ concluded that the BRTs' substantial assets were the result of its wise (or lucky?) investment choices, particularly in the emerging field of cable television. Even if Kanter were the grantor, the STJ already had found that Kanter had renounced the assignment power, precluding a finding of ownership under § 674(a). Because he had found that Kanter was not a grantor, the STJ did not delve into whether the loans the BRTs made to Kanter were of a type that would trigger tax liability under § 675(3).

Again, the Tax Court rejected the STJ's findings. It found that Kanter—not Bea Ritch—was the true settlor of the trusts. To support this finding, it noted that Kanter failed to provide evidence beyond the trust document of Ritch's initial funding of the trusts. It also found implausible that the BRTs had such investment success without being aided by transfers of funds from Kanter's various entities, which were funded in turn by income from his alleged kickback scheme with the Five. After finding that Kanter was the true settlor, it also found that Kanter had the power of disposition over the trusts' assets, disbelieving Kanter's assertion that he had renounced that power. It found particularly meaningful the fact that some 60 trusts were added as beneficiaries after Kanter allegedly renounced his appointment power. The Tax Court's two findings that Kanter was the settlor

and possessed the power of disposition were enough to make him the true owner of the BRTs under 26 U.S.C. § 674(a). Like the STJ, the Tax Court did not specifically address the possible tax liability created by 26 U.S.C. § 675(3) for the loans the BRTs made to Kanter.

The critical issue for us is whether the STJ's finding that Kanter was not the grantor of the BRTs is clearly erroneous. If he is not the grantor, then he cannot be the true owner of the BRTs under either of the provisions outlined above. In this connection, it is important that we already have found no clear error in the STJ's finding that Kanter did not assign income from a supposed kickback scheme to various entities in which the BRTs owned an interest. That alleged device therefore cannot be a basis for finding that he was the true grantor. The Commissioner does not point to any evidence in the record to establish that Kanter provided the funds necessary for the $18,000 OBA investment. What remains is the Commissioner's speculation that the growth of the BRTs' investments (both prior to OBA and afterwards) was so unusual that Kanter, and no one else, must have funded them. It is true that the BRTs experienced strong growth from their inception, but the combination of Kanter's business advice to Weisgal and the wise choice to invest in cable television at the dawn of that industry can explain much if not all of the growth. At the very least, it provides a strong enough basis in the record, in the absence of anything but speculation to the contrary, to support the STJ's finding that Kanter did not fund the BRTs. After the BRTs invested in OBA, Kanter may have directed investors to OBA to

his ultimate benefit. But this does not require the STJ to find that the BRT-OBA deal was predicated on Kanter's efforts (and was thus attributable to him).

Once again, we conclude that the STJ's finding is not clearly erroneous, even though we freely acknowledge that a rational person could just as easily have come to the opposite conclusion on this record. As a result, we need not reach the question whether Kanter had indeed given up his appointment power. We also need not inquire into the nature of the BRTs' loan to Kanter.

**V**

In 1979, the Century Industries ("CI") partnership was formed, and it was reconstituted in 1980. In this reconstituted form, CI had several claimed partners: Kanter, Weisgal, the Bea Ritch Trusts, four Weisgal family trusts, and a partnership composed of irrevocable trusts for the benefit of the Weisgal family (later replaced with another partnership of the same type in 1984). CI's main purpose was to discover attractive investment opportunities that needed capital, which would be supplied by the trust partners. Although Kanter and Weisgal each had only a 1% partnership interest in CI, they did the work of evaluating potential investment opportunities. Various entities paid CI "standby commitment fees" to consider their projects, and these fees were CI's primary source of income during its early years, as it did not pursue any investments until 1987. In 1998 or 1999, the CI partnership was dissolved. For the tax years of 1981-1984 and 1986, the Commissioner determined that Kanter and

Weisgal were the only true partners in CI and thus attributed half of CI's income during this period to Kanter. Because Kanter did not report this income, the Commissioner assessed a deficiency against him based on that income.

Kanter raises the threshold question whether the Tax Court had subject-matter jurisdiction over the 1983, 1984, and 1986 tax years. We review this legal question *de novo*. *Johnson*, 551 F.3d at 567. Here, jurisdiction depends on a particular factual question: whether Kanter and Weisgal were CI's only real partners. We review the STJ's findings related to this jurisdictional fact, like his other factual findings, for clear error.

The Tax Court's jurisdiction depends on whether the Tax Equity and Fiscal Responsibility Act of 1982 ("TEFRA"), 26 U.S.C. §§ 6221-33, applies to CI and the relevant income. In enacting TEFRA, Congress intended "administrative and judicial resolution of disputes involving partnership items to be separate from and independent of disputes involving nonpartnership items." *Maxwell v. Comm'r*, 87 T.C. 783, 788 (1986). Partnership items include "income, gain, loss, deduction, or credit of the partnership." 26 C.F.R. § 301.6231(a)(3)-1(a)(1)(i). The statute calls for disputes regarding partnership items to be settled at the partnership level, rather than at a partner-level proceeding in Tax Court. 26 U.S.C. § 6231(a)(3). In contrast, if the partnership in question is a "small partnership," defined as a partnership with fewer than 10 partners, an individual partner-level proceeding may be

appropriate. 26 U.S.C. § 6231(a)(1)(B)(i). To determine whether someone qualifies as a partner, this court consults

> whether, considering all the facts—the agreement, the conduct of the parties in execution of its provisions, their statements, the testimony of disinterested persons, the relationship of the parties, their respective abilities and capital contributions, the actual control of income and the purposes for which it is used, and any other facts throwing light on their true intent—the parties in good faith and acting with a business purpose intended to join together in the present conduct of the enterprise.

*Comm'r v. Culbertson*, 337 U.S. 733, 742 (1949).

There is no dispute that we are dealing with partnership items, which ordinarily would receive partnership-level treatment under the TEFRA. The question is whether the small-partnership exception lifts this requirement. The STJ found that the listed partners of CI were in fact its true partners. This brought CI within the ambit of TEFRA (as CI had more than 10 partners), and therefore deprived the Tax Court of jurisdiction in this proceeding. The STJ based his ruling on the fact that during the period in question, CI entertained investment proposals from several entities, including ones unrelated to Kanter and Weisgal, and that the trust partners had sufficient resources to commit capital to any investment project that could have come down the line. The STJ did not base his ruling on the fact that capital from the other partners was a material income producing factor (a test derived from Internal Revenue Code § 704(e)); instead, he found

that the partners had a good-faith intent to conduct a business enterprise.

The Tax Court took a different view. It found that only Kanter and Weisgal were partners in CI, and that CI's income was solely the result of personal consulting services that Kanter and Weisgal rendered to the various entities that paid CI. To arrive at this conclusion, the Tax Court relied on the relative inactivity of CI during the relevant period as well as letters in the record from various entities that could be read as establishing a consulting relationship with Kanter and Weisgal. In the Tax Court's eyes, CI fell within the small-partnership exception of TEFRA, the income was taxable at the partner level (*i.e.* Kanter's level), and thus the Tax Court retained jurisdiction over the relevant years.

We find, applying the test outlined in *Culbertson,* that the record adequately supports the STJ's finding that all of the claimed partners of CI were the actual partners. The Tax Court attaches great importance to the letters in the record from entities that paid CI to consider their proposals. For instance, it points to a letter from Satcorp, Inc., to CI that notes that Kanter and Weisgal will serve as "financial engineers" whose involvement is "planning and structuring transactions for financings for Satcorp." While one interpretation of this language (shared by the Tax Court and the Commissioner) is that Kanter and Weisgal were running an unrelated consulting firm disguised as CI, that letter also can support the STJ's view that Kanter and Weisgal were screening various investment proposals to see if CI might provide financing to these entities.

Perhaps an even more damaging piece of evidence (from Kanter's standpoint) is the City & Suburban Distributors letter, in which Weisgal bills the company for the time that he and Kanter spent on their projects. This letter could be seen as describing a consulting business hiding behind the façade of CI. If the Tax Court had been sitting as the original fact-finder, then the Satcorp and City & Suburban letters may have been sufficient to justify holding that Kanter and Weisgal were the only true partners. But, as we have now observed repeatedly, it was not, and neither are we. Confronted with two interpretations of the evidence, we defer to the original fact-finder.

As CI had more than 10 partners, it fell within the provisions of TEFRA. The Tax Court thus lacked jurisdiction over the CI partnership item of partner compensation. See *Blonien v. Comm'r*, 118 T.C. 541, *19-*20 (2002). The remaining issue is whether half of CI's income is attributable to Kanter for the pre-TEFRA years of 1981 and 1982. This question turns on the same factual determination that governed the jurisdictional issue: whether Kanter and Weisgal were the only true partners for CI. As we have already explained, we do not find clearly erroneous the STJ's finding that CI's other partners were *bona fide*. Thus, there are no grounds on which to attribute half of CI's income to Kanter, and the Commissioner assessed a deficiency against Kanter for these years in error.

# VI

In 1982, Kanter deposited over $2.8 million in three bank accounts at American National Bank in Chicago. Linda

Gallenberger, Kanter's accountant, used Kanter's check register, which recorded the source and nature of these deposits, to determine that $443,046.35 of the deposits constituted taxable income. Kanter reported that income on his 1982 tax return. The Commissioner maintains that an additional $1,303,207 constituted taxable income and assessed a deficiency against Kanter for the taxes attributable to that amount. Kanter contests this, claiming that those deposits were nontaxable loans and returns of investment from other entities. While the Commissioner has conceded this issue, we still must consider it to determine whether, or to what extent, the Tax Court erred in its decision to reverse the STJ.

The Commissioner is empowered to use several methods to reconstruct a taxpayer's taxable income. See *Holland v. United States*, 348 U.S. 121, 130-32 (1954) ("To protect the revenue from those who do not render true accounts, the Government must be free to use all legal evidence available to it in determining whether the story told by the taxpayer's books accurately reflects his financial history.") (internal quotation marks omitted). One permissible method is examining a taxpayer's bank deposits. See, *e.g.*, *Nicholas v. Comm'r*, 70 T.C. 1057, 1063 (1978) (using the bank-deposits method). Evidence of bank deposits constitutes *prima facie* evidence of income, see *Boyett v. Comm'r*, 204 F.2d 205, 208 (5th Cir. 1953), and the taxpayer bears the burden of proving that the Commissioner's determinations are erroneous. See *Welch*, 290 U.S. at 115.

Noting that the Commissioner had failed to present any evidence to the contrary, the STJ found that Kanter had

reported all his taxable income in 1982. In doing so, it relied on Gallenberger's testimony, which it found credible, and Kanter's check register. The Tax Court reversed the STJ, finding that Kanter had not produced enough evidence at trial to satisfy his burden of proof. The factors to which it pointed as support for its decision were the large amount of money that was at issue, its previous findings regarding the kickback scheme and tax fraud, and Gallenberger's initial recalcitrance in producing certain documents, which became the subject of summons proceedings.

Neither the Tax Court nor the Commissioner has provided a good reason to doubt the STJ's findings. The size of the deposits alone is not a basis for reversing the STJ; it is not surprising that Kanter, a successful businessman, dealt with large sums of money for investment and other purposes. We already have rejected the Commissioner's and Tax Court's arguments with respect to the Five and have upheld the STJ's findings on that issue, and so that argument fails as well. Finally, Gallenberger's behavior cannot be a basis for reversal either, as she eventually produced all the documents that were requested, and the summons proceedings related to other tax years. See *United States v. Administrative Enters.*, 46 F.3d 670, 674 (7th Cir. 1995) (noting that the summons requested documents relating to tax years 1983-1988). We thus cannot find the STJ's factual findings on this issue to be clearly erroneous.

## VII

As we have found in Kanter's favor on the other issues in his appeal, we need not address his due process arguments.

* * *

For these reasons, we REVERSE the Tax Court's judgment and REMAND with instructions for the Tax Court to VACATE its decision and enter an order adopting the STJ's report as the decision of the Tax Court.